Mr. is it pronounced Mag? Mag, your honor. Very well. Thank you. You may proceed. Good morning. Thank you, your honor. May it please the court. Counsel, my name is Thomas Mag and I represent Matt Grawitch and Mike Woody in this case against Charter. The case is about my clients who were subscribers to Charter Internet Service who believed that they had subscribed to 30 megabaud per second internet service. They were required to use Charter's modems which were provided by Charter for payment, of course. In order to obtain the subscribes for internet speeds required a modem that was different than the one provided by Charter. Suffice it to say, as relates to the two named class representatives, and according to defendant's notice of removal, about 50,000 other potential class members. The modems provided were technologically incapable of operating at the speeds required for the three levels of service that are issue of the lawsuit. It would be the equivalent of buying a Ferrari and Ferrari putting in a four cylinder engine that was incapable of even traveling the speed limit. Despite the fact Ferrari would have promised speeds of 75 miles an hour plus. There are vehicles that can exceed that speed limit with only four cylinders, right? Right, I'm merely speaking as an analogy. Well, would Charter have given them? These modems, these were Charter's modems? The modems were owned, operated, and leased by Charter and provided to the customers including the two named class representatives. When they increased their capability, was there any offer made to give them and to switch out the modem with one that would be capable of the higher speed? Keeping in mind this gets to matters outside of the forecourt of the pleadings and thus we would contend is outside the proper role of a 12B6 motion. The record in this case indicates that a bill was provided in January, sometime after this speed increase, saying that speeds had increased. Call us if you want the full speed. The record in this case also indicates, per the documents attached to the complaint, and thus would be proper for 12B6 consideration, that Charter actively monitors the modems provided to its customers. And that if they identify deficient modems, such as in this case a DOCSIS 2 level modem as opposed to a DOCSIS 3 level modem, which could breach the speed, they would provide notification to the client. And I'm paraphrasing, if a customer did not timely respond, they would start getting browser messages every other day. The most that the record- Respond in what way? That you need to get a new modem? Yes. So, okay, so under the agreement, that is even putting aside the bill for a moment- Yes. You're saying under the documents that were properly considered by the district court, it already says that they will take affirmative action to give you a new modem if you're not achieving the speeds that are promised. Is that what you're saying? I agree with half of what you said. I disagree with the portion of it where you said the district court did consider it. I don't believe the district court actually considered those documents- Could have considered them. But could have considered them, yes. So, what's the problem? I mean, if Charter is going to give you a new modem, and they'll even come out and tell you you need a new modem, and supply you a new modem, I don't understand, what's the harm? The problem is they didn't. You mean, so they didn't- My client, at least seven months after this supposed upgrade, was still operating with a DOCSIS II level modem. Did he contact Charter to ask for a new one? My client didn't even know that he needed a new modem because he never got these browser messages. I mean, candidly, my client thinks he signed up for 30 megabaud service before this free upgrade, but assuming that he didn't, and assuming that he got it as of the date of this upgrade, that's still seven months of service that Charter did not provide the notice that Charter, in its own documents, said that it would actively, affirmatively do. That argument was actually made to the trial courts in the Rule 59E motion, after the 12B6 motion, and summarily rejected because it was not presented in the 12B6 motion, or response to the 12B6 motion, where the trial court was considering this bill, which was outside the four corners of the complaint. Summary of the problem in this case, from a merits standpoint, is that Charter is telling everybody that they'll get this high-speed Internet service, and yet, as is indicated in the brief, in the case of at least 50,000 people, Charter has provided and not upgraded the modem to a modem that's technologically capable of operating at that speed. Was the state-of-the-art there, or they could have, or can they come back and say, hadn't been invented yet, nobody thought about it? On the date of the alleged upgrade, the state-of-the-art was DOCSIS 3, which apparently was provided to Charter's customers other than the two plaintiffs, on this case, and the 50,000 potential class members. So many Charter subscribers received the proper modem, but apparently at least 50,000 did not, despite Charter's assurances that they would actively monitor who had a proper modem and notify them, among other methods, through browser messages every two days if they did not upgrade. The only notification, to the extent it's even a notification, is a bill in January of 2012, which itself, assuming it was received on the date that the bill is dated, is still seven weeks after this upgrade is supposed to have taken place. And notification on the bill isn't even the primary method for notification to take place, which is quoted at length in my brief. It's just an alternative method that they could use in addition to the other mechanisms. What's your response to the argument that there is a specific disclaimer in the agreement that is attached that disclaims any guarantee of a particular modem's particular Internet speed? I'm glad you asked, Your Honor. If you look at that waiver, what it's waiving is a guarantee of any particular Internet speed based on factors outside the control and scope of Charter. For instance, acts of God, government regulation, the user's own personally owned computer. In this case, if you assume, for the sake of argument, that everything else in the world is operating absolutely perfectly based on this modem that Charter provides and is solely and exclusively in the control of Charter because they mandate that it be used, you can't get the 30 megabaud per second speed. What speed can you get with the modem? It appears to me to be closer to 20, but I don't know that that fact is in the record because, quite frankly, no discovery was allowed to be taken place in this case. It was tendered, it was exchanged, but the case was dismissed before any answers were received. I do believe that on some networks outside of Charter's control that a DOCSIS II modem, per what's in the record, would function at the speeds we're talking about, but the record indicates that, at least on Charter's network, a DOCSIS II or a DOCSIS I, apparently some people still have the I modem, just simply cannot operate anywhere near 30 megabaud per second. And I would note some of the potential class members actually subscribe to service substantially in excess of 30 megabaud per second. According to the notice of removal, the affidavit attached thereto, there are persons that still have the DOCSIS II or DOCSIS I modem that can't even operate at the 30 speed. But in direct answer to your question, the disclaimer doesn't disclaim Charter, it only disclaims things outside control of Charter. I would also note that, well, it appears that my primary time is up. I'm into my rebuttal time, about three seconds. So unless there are any questions, I'll just wait until my rebuttal argument. Very well, thank you. Thank you, Your Honors. Mr. Irwin? Good morning. You may proceed. Good morning. May it please the Court. The plaintiff complains of the consideration of the bills, but they don't dispute their accuracy or their authenticity. The plaintiffs say they can't use a faster Internet speed because they don't have a better modem. But Charter told its customers in the bill, you need to upgrade your modem to get the faster speed. They did attach the contract to the complaint and don't complain about considering it, but they want to avoid its terms. And the Section 6 that was referred to just now says that, among other things, it could be the customer's equipment to prevent them from attaining any speed. And, in fact, Charter doesn't guarantee any particular speed at all. We generally say you can't consider matters outside the four corners of the complaint. Yes. How do we get to the bill? How can we consider that without converting this case to a motion for summary judgment? Well, first of all, as I mentioned, they do not challenge the accuracy or the authenticity of the bill. Well, but they may challenge whether they got it. Well, they haven't done so. Let's put it that way. And as far as I know, they paid it. The other thing is that it's integral to the complaint because it helps to identify who's in the class. As a matter of fact, we identified the wrong Mr. Woody in the initial motion to dismiss the complaint, and they attached the right Mr. Woody's bill. And so, therefore, we came up with the right Mr. Woody's bill, the complete bill, in reply. And so I think the parties really haven't challenged the bill at all other than here to say it shouldn't be considered. And the reason they don't want it considered, because it says right on its face, actions required. We've increased our speeds for Charter Plus and Ultra customers. In order to enjoy your full speed increase, you will need to upgrade your modem. So if I got that bill and wanted the faster speed, what would I do? Just call Charter and they'd either send me one or I'd pick one up? It says contact Charter, go to the website or contact Charter customer service. So what would happen if I contact? I call the number on the bill, what happens then? Make arrangements to provide a new modem, and it would be provided. At no additional cost? Well, the modem itself, I believe, is leased. I think one of the plaintiffs pays $7 a month to lease the modem, but as far as the installation, I don't know if there's any particular cost. Nothing that was alleged here. Is the lease, if you're paying $7 a month for the, what is it? For the modem. The modem. The modem is leased. Do you get the upgraded one for the same price is what I'm asking? I don't know what the price is of the upgraded one, but the service would be the same. The cost of the service is the same. It's not changed. If you get 30 meg or 20 meg or whatever it would be, it's still $10 a month to receive that. Was a state-of-the-art available at the time this decision was made by your client to make this offer? Was there an adequate modem out there in the marketplace that didn't get considered in this problem that now has come to fruition, I guess, by the complaint? Yes. Yes, Your Honor. There's an adequate modem. As he said, the 3.0 modem would be sufficient to receive the 30 meg speed. And so there was adequate equipment. They didn't have it, but they were told that they would need to get it in order to get the increased speed from 20 or whatever they were getting up to 30. What's your response or charter's position on this issue that the contract itself that is attached to the complaint specifically says that they're going to monitor and they're going to send, I don't know, text messages or I can't remember exactly how it's done, but they're going to send you computer messages that you need a higher speed modem. Was that done or what's your response? Two points, one legal, one factual. First, factual, that's really not part of the contract. That's something I think is off a web page, charter's website. So it wasn't part of the actual contract. Yes, it was attached to the complaint, but the complaint itself never even mentions the fact that it's attached to the complaint or what that document is. For the very first time, the first time they ever mentioned that and came up with this new theory was after the court had already entered its order dismissing the complaint for failure to state a claim. And under Rule 59, you can't come in with a new theory, particularly when it's based upon a document you've already attached to the complaint and you didn't say anything about it before. So I think that's not even a proper argument to be raised. And it's not part of the contract. The contract says we'll provide the modem, but we don't guarantee any particular speed. And one of the reasons you might not be able to attain speed is you might not have the right equipment. And that's specifically in the contract. And in addition, they don't have any pecuniary damages. I mean, they weren't being charged anything extra for this. If they kept the 20 and wanted to upgrade to the 30, they would have paid the same price. It didn't matter. Whatever price they were paying was the same price that it was, would be if they upgraded or if they didn't upgrade. The only difference is they didn't have the 3.0 modem. They would have the high-speed Internet, but it wouldn't be as high a speed as they could get if they wanted it. The plaintiff has also questioned the subject matter jurisdiction of the courts. But, again, this was something that came up post-judgment. And they have come up with various theories by which the amount in controversy might be less than $5 million. But the question is not whether you can come up with a theory where there's less, but whether there's a plausible way in which it could be more if the plaintiff was able to prove their case. Among the things they've said is, well, we wouldn't have bought Internet service at all from Charter. Well, that was $40 to $55 a month. More than 50,000 customers for whatever period you want to select, well over $5 million. $10 a month for the high-speed Internet. The plus customers paid an extra $10 a month for whatever period you want to select, over $5 million. So I don't think there's any question, but the amount in controversy here was satisfied. Which, of course, is a different concept from the question of whether the plaintiff could actually prove any damages or prove any liability. We're not required to show that in order to remove the case. And, in fact, under the plaintiff's theory that if the defendant shows there's no damages or shows there's no liability, there would never be any federal jurisdiction in a diversity case. Because they would say there's no amount in controversy if the defendant wins. Well, that's not the way it works. I mean, obviously, the amount in controversy doesn't depend upon the actual facts, the actual proof, or what the actual legal principles that might be applied that would be in favor of the defendant. Here, the plaintiffs were notified that they needed to get a new modem. If they wanted the upgrade, if they wanted to get the faster service, a contract provides that we don't guarantee any service. And one of the reasons you might not get it is because your equipment might not be sufficient. You may need new equipment. And, thirdly, they didn't have any damage anyway. It didn't cost them any more to get the upgrade than to not get the upgrade. They didn't have any kind of a damage that they've alleged, any kind of pecuniary loss, which is necessary under the Missouri Merchandising Practices Act, which is count one, or any damage under breach of contract. It's very much like the ABS case, Briel v. GM, that we have cited and discussed in our brief. The plaintiff has to have some allegation of facts that would show an actual loss and not simply that I didn't get a modem that I was told I had to get. The court has no further questions. Thank you. We ask the court to affirm the district court's decision. Mr. Magg. How about in response to his last statement there? Which particular last? Well, I guess his argument is that nobody was required to take this. The equipment would operate. It probably wouldn't operate at the speed that the new technology that was available did. And the end user was the one who was at risk here and not the company for any misleading statements it may have made or foisted upon their subscribers. The Internet business is a very competitive business, full of multiple competitors. You have AT&T. You have Charter. I believe Verizon offers some Internet services. And quite frankly, the technology is constantly advancing. If any one of these companies finds itself in a position where it does not improve its services as technology advances, quite frankly, they're going to go the way of Ma Bell. I mean, landline telephones are, while they're not extinct, they're becoming exceedingly rare. Telephone companies don't make money off having landline telephone services. By the same token, dial-up Internet service, which at least ten years ago was fairly common, fairly standard, is all but extinct at this point. Anybody, any Internet provider that does not regularly upgrade their service, such as Charter, hypothetically, is going to have their subscribers move over to AT&T for better service at the same price. That's what this whole upgrade, quote-unquote, is about, is the fact that other Internet providers improve their service, and Charter wants to keep pace. The reason it wants to keep pace is it doesn't want to lose subscribers. So to say that the subscribers got something for free simply isn't true. Charter got the benefit by telling people we've upped our service to 30 megabaud of having people not leaving Charter and going to AT&T. The subscriber with Charter gets the benefit of, hey, my service has just been improved. I don't have to switch over to AT&T, except in the case of the two named class representatives and at least 50,000 people per the notice of removal. They didn't get the service. And the reason they didn't get the service wasn't their fault, wasn't the fault of an act of God, wasn't the fault of Internet traffic, wasn't the customer's computer systems, wasn't system capacity limitations, governmental actions, or events beyond Charter's control. It's because Charter just never got around to doing what Charter said it would do and notifying them that they needed to upgrade their modem. Charter affirmatively took steps, or at least said they would take steps, to notify persons who had inferior or inadequate modems of the need to upgrade. The most Charter can say is that it provided one bill message, about that big, on a bill that comes in the mail. I think it's fair to say most people don't read their bills very closely. But Charter promised to do more than that. That was something they promised to do in addition to the primary notification. That was something they promised to do in addition to browser notifications, which they didn't do. Basically, seven months after Charter's quote-unquote free upgrade, which really wasn't free as I've explained, 50,000 people still can't get the service that Charter is promising because Charter hasn't done what Charter said Charter would do. Does that answer your question? I think so. Thank you. It is a little confusing. There's very little time left. I'll just very quickly address subject matter jurisdiction. The four corners of the complaint, the well-pleaded complaint rule, is what governs federal jurisdiction. Thus, in order for a case to be removable, the four corners of the complaint must plead an amount in controversy in excess of, under CAFA, $5 million. The motion to dismiss in this case and the ruling of the district court was that we didn't plead damages. If we're not pleading damages under the complaint, that's different than saying we've pled damages under the complaint and we can't prove it. Either we've pled damages under the complaint sufficient to invoke federal subject matter jurisdiction and thus sufficient under Rule 12b-6, or we haven't, which may ultimately result in us losing the case, but losing the case in the state court, and I see that I'm out of time. Very well. We thank you for the argument on both sides, and the case is now submitted. Thank you, Your Honors.